IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

COMMONWEALTH OF VIRGINIA    )
    )
    v.    )    Case No. 1:21-cr-00091-CMH
    )
ALEJANDRO AMAYA    )

## COMMONWEALTH'S OPPOSITION TO MOTION TO DISMISS

Mark R. Herring (VSB No. 31718)
*Attorney General*

Erin B. Ashwell (VSB No. 79538)
*Chief Deputy Attorney General*

Steve T. Descano (VSB No. 89881)
*Commonwealth's Attorney for Fairfax County*

Kyle Manikas (VSB No. 71234)
*Chief Deputy Commonwealth's Attorney*

Matthew B. Lowery (VSB No. 41662)
*Deputy Commonwealth's Attorney*

Michelle S. Kallen (VSB No. 93286)
*Acting Solicitor General*

Kendall T. Burchard (VSB No. 95710)
*John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

INDEX OF EXHIBITS ................................................................................................... vi

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

  I.   Factual Background .............................................................................................. 1

  II.  Procedural Background......................................................................................... 8

LEGAL STANDARD...................................................................................................... 9

ARGUMENT ................................................................................................................ 10

  I.   Amaya is not entitled to Supremacy Clause immunity because a reasonable trier of fact could conclude that Amaya was not authorized by federal law to act as he did ............... 12

      A.   Amaya's actions were inconsistent with federal law and Park Police policy ........... 12

      B.   Amaya's authority did not extend to violations of the Constitution and to actions taken with criminal intent .......................................................................................... 18

  II.  Amaya is not immune because he failed to eliminate any dispute that, in pursuing and killing Ghaisar, his actions were no more than necessary and proper in performing his federal duties ................................................................................................................ 22

      A.   Amaya's actions exceeded what was necessary and proper........................................ 23

      B.   A reasonable trier of fact could disagree with Amaya's summary assertion that he had a subjective belief that Ghaisar posed a risk to officers or the public ............... 25

      C.   Even if Amaya subjectively believed his actions were justified, a reasonable trier of fact could find that belief objectively unreasonable .................................................. 26

CONCLUSION............................................................................................................... 30

CERTIFICATE OF SERVICE ...................................................................................... 31

i

# TABLE OF AUTHORITIES

Page

**Cases**

*Anderson v. Creighton,*
  483 U.S. 635 (1987) .................................................................................. 26

*Arizona v. Files,*
  36 F. Supp. 3d 873 (D. Ariz. 2014) ...................................................... 20, 25

*Arizona v. Manypenny,*
  451 U.S. 232 (1981) .................................................................................. 11

*Baker v. Grice,*
  169 U.S. 284 (1898) ............................................................................ 10, 11, 29

*Birsch v. Tumbleson,*
  31 F.2d 811 (4th Cir. 1929) ................................................................ 10, 22, 29

*Butz v. Economou,*
  438 U.S. 478 (1978) .................................................................................... 1

*Clifton v. Cox,*
  549 F.2d 722, 729 (9th Cir. 1977) ............................................................ 25

*Colorado v. Symes,*
  286 U.S. 510 (1932) .......................................................................... 11, 12, 20

*Cunningham v. Neagle,*
  135 U.S. 1 (1890) ............................................................................... passim

*Denson v. United States,*
  574 F.3d 1318 (11th Cir. 2009) ................................................................ 18

*Drummond ex rel. Drummond v. Anaheim,*
  343 F.3d 1052 (9th Cir. 2003) ................................................................. 27

*Ging v. Ging,*
  18 Neb. App. 145, 775 N.W.2d 479 (2009) ............................................... 25

*Graham v. Connor,*
  490 U.S. 386 (1989) .................................................................................. 18

*Gulf Islands Leasing, Inc. v. Bombardier Cap., Inc.,*
  215 F.R.D. 466 (S.D.N.Y. 2003) .............................................................. 28

*Gutierrez v. San Antonio,*
  139 F.3d 441 (5th Cir. 1998) ................................................................... 27

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) .................................................................................. 23

*Harris v. Pittman,*
  927 F.3d 266 (4th Cir. 2019),
  *cert. denied*, 140 S. Ct. 1550 (2020) ..................................................... 18, 19

*Heath v. Alabama*,
    474 U.S. 82 (1985) ............................................................................................ 30

*Idaho v. Horiuchi*,
    253 F.3d 359 (9th Cir.),
    *vacated as moot*, 266 F.3d 979 (9th Cir. 2001) ............................................. passim

*In re Fair*,
    100 F.149 (C.C.D. Neb. 1900) ........................................................................ 20

*Isaac v. Googe*,
    284 F. 269 (5th Cir. 1922); ....................................................................... 12, 17

*Kentucky v. Long*,
    837 F.2d 727 (6th Cir. 1988) ....................................................................... 9, 10

*Martin v. Cavalier Hotel Corp.*,
    48 F.3d 1343 (4th Cir. 1995) ...................................................................... 25, 27

*Maryland v. DeShields*,
    829 F.2d 1121 (4th Cir. 1987) .................................................................... 18, 20

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) ...................................................................................... 10, 11

*Morgan v. California*,
    743 F.2d 728 (9th Cir. 1984) ................................................................. 11, 22, 29

*New York v. Tanella*,
    374 F.3d 141 (2d Cir. 2004) ....................................................................... passim

*Patterson v. New York*,
    432 U.S. 197 (1977) ............................................................................................ 11

*Petition of McShane*,
    235 F. Supp. 262 (N.D. Miss. 1964) ......................................................... 10, 25

*S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*,
    690 F.2d 1235 (9th Cir. 1982) ......................................................................... 26

*Screws v. United States*,
    325 U.S. 91 (1945) ............................................................................................... 8

*Sotnikau v. Lynch*,
    846 F.3d 731 (4th Cir. 2017) ........................................................................... 20

*Tennessee v. Garner*,
    471 U.S. 1 (1985) ............................................................................................... 19

*Texas v. Kleinert*,
    855 F.3d 305 (5th Cir. 2017),
    *cert denied* 138 S. Ct. 642 (2018) ............................................................. 22, 25

*United States ex rel. Bradshaw v. Alldredge*,
    432 F.2d 1248 (3d Cir. 1970) .......................................................................... 25

*United States ex rel. Touhy v. Ragen*,
   340 U.S. 462 (1951) .......................................................................................... 8

*United States ex rel. Drury v. Lewis*,
   200 U.S. 1 (1906) .......................................................................... 9, 10, 11, 17

*United States v. Allen*,
   No. 17-po-7135, 2018 WL 1035770 (D. Md. Feb. 23, 2018) ................................ 16

*United States v. Hernandez-Ayala*,
   No. 16-po-4622, 2017 WL 2666243 (D. Md. June 21, 2017) ............................... 16

*United States v. Jones*,
   428 F. Supp. 2d 497 (W.D. Va. 2006) ................................................................ 16

*United States v. LaFountain*,
   No. 12-po-6164, 2013 WL 391153 (D. Mass. Jan. 29, 2013) ............................... 16

*United States v. Weaver*,
   659 F.3d 353 (4th Cir. 2011) ............................................................................. 9

*Wagner v. Southern Calif. Edison Co.*,
   No. 2:16-cv-06259-ODW(PLA), 2019 WL 1746127 (C.D. Cal. Apr. 18, 2019),
   *aff'd*, 840 Fed. Appx. 993 (9th Cir. 2021) ........................................................ 28

*Weigel v. Broad*,
   544 F.3d 1143 (10th Cir. 2008) ....................................................................... 27

*Williams v. Strickland*,
   917 F.3d 763 (4th Cir. 2019) ........................................................................... 19

*Wyoming v. Livingston*,
   443 F.3d 1211 (10th Cir. 2006) ....................................................................... 23

**Constitutions, Statutes, and Rules**

U.S. Const. amend. IV .............................................................................. 18, 19, 20

U.S. Const. art. VI, cl. 2 ................................................................................ passim

**Statutory Authorities**

16 U.S.C. § 1a-6(b) (2014) ................................................................................. 17

18 U.S.C. § 111 ................................................................................................. 18

18 U.S.C. § 1114 ............................................................................................... 18

18 U.S.C. § 242 ................................................................................................... 9

28 U.S.C. § 1442 ................................................................................................. 9

28 U.S.C. § 1455 ................................................................................................. 9

54 U.S.C. § 102701 ..................................................................................... passim

Va. Code Ann. § 18.2-266 ................................................................................. 18

Va. Code Ann. § 18.2-270 ................................................................................. 18

Va. Code Ann. § 18.2-36 ............................................................................................. 9, 21

Va. Code Ann. § 18.2-56.1 .......................................................................................... 9, 21

Va. Code Ann. § 19.2-79 ......................................................................................... 6, 15, 19

Va. Code Ann. § 46.2-868 ............................................................................................... 18

Va. Code Ann. § 46.2-894 ...................................................................................... 4, 6, 15, 18

**Rules**

Fed. R. Crim. P. 12(b)(1) ................................................................................................ 9

**Other Authorities**

Mathew Bender & Company, Inc., Virginia Model Jury Instructions – Civil: Release 20, March 2020, Instruction No. 4.040 ......................................................................................... 21

Model Penal Code § 2.02 ................................................................................................ 22

U.S. Park Pol. Gen. Or. 2101 ........................................................................................... 2

U.S. Park Pol. Gen. Or. 2205 ..................................................................................... passim

U.S. Park Pol. Gen. Or. 2210 ........................................................................................... 7

U.S. Park Pol. Gen. Or. 3601 .................................................................................. 5, 14, 22

U.S. Park Pol. Gen. Or. 3615 ................................................................................... 14, 15

v

# INDEX OF EXHIBITS

Exhibit A:          United States Park Police General Order 2205 (Vehicular Pursuits)

Exhibit B:          United States Park Police General Order 2101 (Arrest)

Exhibit C:          Federal Law Enforcement Training Center Transcript of Alejandro Amaya

Exhibit D:          Alejandro Amaya Record of Training and Qualifications

Exhibit E:          E-mail from Deputy Chief Gregory T. Monahan, United States Park Police, to
                    Agent Giulio Arseni (January 10, 2018, 1:10 p.m.)

Exhibit F:          Dep't. of Interior Investigator's Traffic Crash Report

Exhibit G:          Interview with Atif Rehman

Exhibit H:          Federal Law Enforcement Training Center Training Directorate

Exhibit I:          United States Park Police General Order 3601 (Firearms)

Exhibit J:          United States Park Police General Order 2210 (Roadblocks)

Exhibit K:          Federal Bureau of Investigation Laboratory Report

Exhibit L:          Medical Examiner Report

Exhibit M:          United States Park Police General Order 3615 (Use of Force)

Exhibit N:          Expert Report of Dr. Christopher Chapman

## INTRODUCTION

Defendant Alejandro Amaya asks the Court to dismiss charges against him for acts that caused the death of unarmed 25-year-old Bijan Ghaisar. He introduces no evidence to support his position and, at the same time, demands that the Court deny the Commonwealth the opportunity for an evidentiary hearing. Amaya's position is tenable only if he is immune as a matter of law from prosecution for killing a civilian, regardless of the facts. He is not.

It is well established that "a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers." *Butz v. Economou*, 438 U.S. 478, 489 (1978). This is true when the controlling law is state law just as it is when the controlling law is federal law. At issue here is whether there is a genuine issue of fact as to whether Amaya is entitled to Supremacy Clause immunity such that he can, with impunity, violate Virginia's prohibitions on reckless discharge of a firearm and involuntary manslaughter. He cannot.

## BACKGROUND

On November 17, 2017, Amaya and his fellow United States Park Police officer, Lucas Vinyard, shot and killed 25-year-old Bijan Ghaisar in a residential neighborhood in Virginia. The officers' actions were inconsistent with their training and with state and federal law.

### I.    Factual Background

### A.        The United States Park Police

The United States Park Police is a division of the National Park Service within the Department of the Interior. Established by George Washington in 1791 to protect federal property in Washington, D.C., the Park Police still operates as the principal law enforcement authority in federal parks—such as the National Mall or the Golden Gate National Recreation Area—and over other federal property, including the George Washington Memorial Parkway.

The Park Police's statutory authorization to "maintain law and order and protect individuals and property within [National Park] System units" is limited by applicable law and Park Police General Orders. 54 U.S.C. § 102701(a)(1). Although officers may "carry firearms," "conduct investigations," and "make arrests without warrant," these powers are confined to certain circumstances in specific locations.[1] 54 U.S.C. § 102701(a)(2). Similarly, Park Police General Orders establish and define the boundaries of its officers' authority. For example, General Order 2205 specifies the narrow circumstances under which vehicular pursuits are permitted, and General Order 2101 confines when and where an officer may conduct arrests. See USPP Gen. Ors. 2205 (Ex. A) & 2101 (Ex. B). These orders, combined with pertinent state and federal law, constrain the Park Police's power.

### B.        Officer Alejandro Amaya

Amaya joined the United States Park Police after completing his training at the Federal Law Enforcement Training Center in December 2009. See Federal Law Enforcement Training Center Transcript of Alejandro Amaya (Amaya Transcript) (Ex. C). He received "satisfactory" marks in law enforcement driving skills, officer response tactics, and active threat response tactics, among other classes. *Id.* at 1. Each year of his employment, Amaya completed refresher training courses on permissible uses of force and other law enforcement techniques. Alejandro Amaya Record of Training and Qualifications (Ex. D) at 1. At the time he shot Ghaisar, Amaya held a current qualification rating for his issued firearm. *Id.* at 1; see also E-mail from Deputy Chief Gregory T. Monahan, United States Park Police, to Agent Giulio Arseni (January 10, 2018, 1:10 p.m.) (Monahan E-mail) (Ex. E) (identifying the serial number of Amaya's weapon).

---

[1] These include certain "designated areas," including the District of Columbia, its "environs" (such as the City of Alexandria), and various portions of New York, San Francisco, and New Jersey. See USPP Gen. Ors. 2101.02(B)–(F).

### C.      The Death of Bijan Ghaisar

Shortly after 7:20 p.m. on November 17, 2017, 25-year-old Bijan Ghaisar was rear-ended by an Uber driver just south of Marina Drive on the George Washington Parkway.[2] Dep't. of Interior Investigator's Traffic Crash Report (Crash Report) (Ex. F). Rather than exchange information with the other driver, Ghaisar continued to drive. Summary of Interview with Atif Rehman (Rehman Interview) (Ex. G) at 2. The Uber driver's passenger called 911 to report the accident, advising the operator that the other car involved was a Jeep Cherokee with the license plate "BIJAN." *Id.* The 911 operator directed the report to the Park Police.

At approximately 7:32 p.m., Park Police dispatchers requested area officers look out for the Jeep. Summary Presentation at 5:10–36 (ECF #8-1).[3] Dispatch's initial description incorrectly stated that Ghaisar's Jeep was the striking vehicle. It corrected its report within minutes. Summary Presentation at 7:01–7:27; see also Amaya Br. 5.

Officers Vinyard and Amaya soon located Ghaisar's vehicle and began pursuit. Summary Presentation at 7:30–42; see also 8:56–9:17. Vinyard drove and Amaya principally communicated with dispatch. Amaya relayed that they were driving at "49 miles per hour" and described traffic on the Parkway as "light," with "clear" road conditions. Summary Presentation at 9:01–07. Amaya admits that the officers "did not have information about the extent of damage to either car" and consequently did not know "whether the crime was a felony or misdemeanor" under Virginia Code § 46.2-894. Amaya Br. 5. Fairfax County Police Department Lieutenant Daniel Gohn joined the pursuit shortly after and captured much of the incident on the in-car

---

[2] The Uber driver received a citation for failure to maintain proper control of his vehicle. Crash Report at 1. It was later dismissed.

[3] Although Amaya submitted the Summary Presentation with his brief, he only referenced it in a footnote. See Amaya Br. n.1. He otherwise failed to rely on it.

video recorder mounted on his dashboard. Summary Presentation at 9:52–55; Dashcam Video at 19:38:11–14.[4] The footage captures three encounters between the officers and Ghaisar.[5]

### 1.    The Parkway Stop

At approximately 7:38 p.m., Ghaisar's Jeep slowed to a halt. Summary Presentation at 10:01–02; Dashcam Video at 19:38:18–21. Contrary to federal law enforcement training—which instructs officers to park *behind* a stopped vehicle to "[e]hance[] illumination" and "provide[] protection from traffic," FLETC Training Directorate (Ex. H) at 11—the officers instead pulled the cruiser *in front* of Ghaisar's Jeep. Summary Presentation at 10:01–02; Dashcam Video at 19:38:18–21. Amaya then exited the cruiser from the passenger side, immediately drew his weapon, and advanced.[6] Summary Presentation at 10:02–04; Dashcam Video at 19:38:21–23.

With his weapon in his right hand, Amaya grabbed for the driver's side door handle with his left "to open Ghaisar's door to make an arrest." Amaya Br. 7; Summary Presentation at 10:06–07; Dashcam Video at 19:38:24–26. After realizing the door was locked, Amaya claims he ordered Ghaisar to open the door. Amaya Br. 7. Ghaisar did not, and Amaya smashed the butt of his issued firearm against the Jeep's rear driver's side window as Ghaisar drove away. Summary Presentation at 10:06–07; Dashcam Video at 19:38:24–26. Fairfax's Lieutenant Gohn took over the pursuit while Vinyard and Amaya reentered Vinyard's cruiser. Summary

---

[4] The Summary Presentation's time stamps differ from those presented on the dashboard camera's video. For the Court's convenience, the brief contains parallel citations throughout.

[5] In his motion, Amaya suggests that the officers first encountered Ghaisar around 7:34 p.m. Amaya Br. 6. He cites no evidence and submits no affidavit describing this encounter.

[6] Amaya's immediate display of his firearm was inconsistent with Park Police General Orders. Under General Order 3601, firearms should not be displayed unless "a degree of imminent danger exists that necessitates the possible use of the firearm for the officer's safety or the safety of others." USPP Gen. Or. 3601.02(D) (Ex. I). Officers, moreover, are to "immediately notify" their supervisors of any firearm displays "by radio or other available means." *Id.* at 3601.04(E). Amaya failed to do so.

Presentation at 10:10; Dashcam Video at 19:38:30. The Park Police officers resumed the lead shortly thereafter. Summary Presentation at 11:17; Dashcam Video at 19:39:35.

### 2.  The West Boulevard Stop

A few seconds after the Park Police officers resumed the principal pursuit position, Ghaisar signaled a right turn off the George Washington Parkway and onto West Boulevard. Summary Presentation at 11:36–45; Dashcam Video at 19:39:55–40:03. Despite leaving their primary jurisdiction on the Parkway and entering Fairfax County Police Department's jurisdiction, Vinyard and Amaya retained control over the pursuit.[7]

The officers again stopped the cruiser in front of the Jeep, notwithstanding their training to the contrary.[8] Summary Presentation at 11:53; Dashcam Video at 19:40:12. Yet again, Amaya immediately displayed his firearm (in contravention of Park Police policy) as the officers exited the cruiser and approached Ghaisar's car.[9] Summary Presentation at 11:54–56; Dashcam Video at 19:40:13–15. Amaya again tried to open the Jeep's door. Summary Presentation at 11:54–56; Dashcam Video at 19:40:13–15. When his efforts proved futile, Amaya kicked the rear quarter

---

[7] In his motion, Amaya asserts that "both Virginia law and Park Police policy authorize Park Police Officers to continue pursuits off the Parkway." Amaya Br. 3. Amaya ignores the limitations on that authority. The Virginia Code allows officers "in close pursuit" of a person suspected of "committ[ing] *a felony*" to continue into the Commonwealth. Va. Code Ann. § 19.2-79 (emphasis added). But as Amaya admits (Amaya Br. 5), the officers did not have enough information at the time to know whether Ghaisar had actually committed a felony. See Va. Code Ann. § 46.2-894(i) (noting a violation of the provision will only amount to a felony "if the accident results in injury to or the death of any person, or if the accident results in more than $1000 of damage to property"). The Park Police General Order on vehicular pursuits, moreover, explicitly provides that "[a]s soon as practical, the pursuit *shall* be relinquished to police units of the entered jurisdiction." USPP Gen. Or. 2205.04(B)(4) (emphasis added). The officers' actions were contrary to both.

[8] See page 4, *supra*.

[9] See note 6, *supra*.

panel of the Jeep as Ghaisar drove away. Summary Presentation at 11:56; Dashcam Video at 19:40:15. The officers returned to the cruiser and resumed the pursuit.

### 3. The Alexandria Avenue Stop

At approximately 7:41 p.m., the Jeep turned westbound onto Alexandria Avenue as the officers followed. Summary Presentation at 11:59–12:03; Dashcam Video at 19:40:18–22. The cars passed Officer Bryant Hartzell of the Fairfax County Police Department, who at the time was attempting to deploy stop sticks to deflate the Jeep's tires and bring the chase to an end. Summary Presentation at 12:53–56; Dashcam Video at 19:41:11–19:41:15. The Jeep eventually stopped at the stop sign at the intersection of Alexandria Avenue and Fort Hunt Road. Summary Presentation at 12:59–13:01; Dashcam Video at 19:41:18–20. The officers again drove the cruiser in front of Ghaisar's Jeep, this time creating a roadblock by turning the cruiser's passenger side almost perpendicular to the front of the Jeep.[10] Summary Presentation at 13:02–07; Dashcam Video at 19:41:21–26.

Firearm drawn, Amaya exited the front passenger seat of the cruiser and confronted Ghaisar at gunpoint for the third time. Summary Presentation at 13:10–13; Dashcam Video at 19:41:29–31. Amaya slowly worked his way to his right, toward the driver's window. Summary Presentation at 13:10–14; Dashcam Video at 19:41:29–32. The Jeep inched forward. Summary Presentation at 13:14; Dashcam Video at 19:41:32. Amaya fired a shot through the windshield of the Jeep and the vehicle stopped. Summary Presentation at 13:14; Dashcam Video at 19:41:33.

---

[10] Under Park Police General Order 2210, a "[s]tationary roadblock" is defined as a barricade—including a vehicle—used "to close a roadway ahead of a pursuit." USPP Gen. Or. 2210.03(B) (Ex. J). They are to be used only as "a last resort" to effectuate "the immediate apprehension of a fleeing suspect." *Id.* at 2210.01. To perform a roadblock, an officer must obtain authorization from their supervisor. *Id.* Notably, the officers did not seek or obtain the required permission.

In fractions of a second, the brake lights disengaged, Summary Presentation at 13:15; Dashcam Video at 19:41:34, and Amaya fired three more rounds through the windshield, Summary Presentation at 13:16–17; Dashcam Video at 19:41:34–35.

Simultaneously, Vinyard rounded the back of the cruiser, drew his firearm, and fired his first shot at Ghaisar through the driver's window. Summary Presentation at 13:15; Dashcam Video at 19:41:36. The brake lights reignited, Summary Presentation at 13:17; Dashcam Video at 19:41:36, only to dim again as the car began to creep right, Summary Presentation at 13:22–24, Dashcam Video at 19:41:41–43. Vinyard shot two additional rounds in rapid succession. Summary Presentation at 13:25, Dashcam Video at 19:41:43. The car stopped,[11] Summary Presentation at 13:26–37; Dashcam Video at 19:41:43–55, and both officers fired another round as the car began to roll off the road, Summary Presentation at 13:37–39; Dashcam Video at 19:41:56–57. Vinyard fired one final shot as the car careened into a ditch on its right. Summary Presentation at 13:40; Dashcam Video at 19:41:59.

### 4.    Aftermath

Once Ghaisar's Jeep fell off the road, Vinyard, Amaya, and the Fairfax County Police Department performed a security sweep to check the car for additional occupants. Summary Presentation at 13:45–end; Dashcam Video 19:42:04–end. Finding none, they began to render aid to Ghaisar. *Id.* Emergency Medical Services eventually pulled Ghaisar from his car and transported him to Inova Fairfax Hospital, where he succumbed to his injuries ten days later. All told, Vinyard and Amaya fired five shots each. FBI Laboratory Report (Ex. K). Ghaisar

---

[11] At this point, Officer Hartzell appears on the video. Summary Presentation at 13:25; Dashcam Video at 19:41:44. Later, Fairfax County Police Officer Daniel Gohn is also visible. Summary Presentation at 14:10; Dashcam Video at 19:42:28.

sustained five gunshot wounds: four to the head and one to the wrist. Medical Examiner Report (Ex. L) at 3. The medical examiner report listed homicide as the cause of death. *Id.* at 5.

## II.    Procedural Background

Even before Ghaisar died, the Federal Bureau of Investigation began investigating the shooting at the request of the United States Park Police Chief. Over the course of two years, the FBI interviewed over 150 witnesses.[12] Amaya Br. 2. Ultimately, the Department of Justice declined to prosecute the officers under 18 U.S.C. § 242 because the Department concluded there was "insufficient evidence to establish beyond a reasonable doubt that the officers *willfully* committed a violation of 18 U.S.C. § 242."[13] Press Release, United States Attorney's Office for the District of Columbia, Federal Officials Close Investigation Into the Death of Bijan Ghaisar (Nov. 14, 2019), https://www.justice.gov/usao-dc/pr/federal-officials-close-investigation-death-bijan-ghaisar (emphasis added).

On October 15, 2020, a Fairfax special grand jury returned indictments against both officers on two state criminal counts: (a) involuntary manslaughter for "feloniously kill[ing] and slay[ing]" Ghaisar in violation of Virginia Code § 18.2-36; and (b) reckless discharge of a firearm in violation of Virginia Code § 18.2-56.1(A1). ECF #1-1. On November 17, 2020,

---

[12] After months of refusing to grant authorization to allow federal agents to freely speak with the Commonwealth, the Department of Justice recently reconsidered that position and has now authorized Department personnel to communicate with the Commonwealth's Attorney and to share all appropriate information and evidence consistent with the Department's *Touhy* obligations. Because the Commonwealth only recently received materials from the Department, it has not yet had an opportunity to review everything. Additional evidence may, therefore, be uncovered.

[13] To secure a criminal conviction under Section 242, the Department must establish three elements: (1) the defendant acted "under color of" law; (2) the defendant acted "willfully"; and (3) the defendant deprived the victim of rights under the Constitution or federal law or subjected them to different punishments on account of a protected characteristic. See *Screws v. United States*, 325 U.S. 91 (1945); cf. Va. Code Ann. § 18.2-36 (involuntary manslaughter), Part I(B), *infra*.

Amaya filed a notice of removal under 28 U.S.C. §§ 1442 and 1455. ECF #1. This Court accepted jurisdiction after a hearing on April 23, 2021. ECF #2. Both defendants now move to dismiss the indictments against them on the basis of Supremacy Clause immunity.[14]

## LEGAL STANDARD

Amaya raises his Supremacy Clause immunity defense by way of a motion to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(1). This provision allows a defendant to raise by pretrial motion "any defense . . . that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). "In such circumstances, the district court may grant the motion only if the facts supporting the immunity claim are not in dispute." *Idaho v. Horiuchi*, 253 F.3d 359, 367 (9th Cir.), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) ("[A] district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts."). The evidence is viewed in the light most favorable to the non-moving party. *Horiuchi*, 253 F.3d at 367 ("In determining whether material facts are in dispute, the district court must give the non-moving party the benefit of all doubts, both as to the basic facts and the inferences to be drawn from those facts."); *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004); *Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988).

Amaya thus must show that all reasonable triers of fact would conclude that: (1) Amaya had authority to act as he did; and (2) Amaya did no more than what was necessary and proper. See *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 8 (1906) (rejecting Supremacy Clause

---

[14] Vinyard is represented by different counsel in another case. See *Commonwealth of Virginia v. Vinyard*, No. 1:21-cr-00092-CMH (E.D. Va.).

immunity when "there was a conflict of evidence as to whether [the victim] had or had not surrendered"); *Horiuchi*, 253 F.3d at 366 n.9 ("*Drury* actually holds . . . [that e]ven if it is *not* clear that the federal agents acted unlawfully, the state may proceed with the prosecution if it has evidence which, if believed, would render the federal agents' conduct unlawful."). If the Commonwealth raises a genuine dispute on the facts, the motion to dismiss should be denied. See *Tanella*, 374 F.3d at 148; *Long*, 837 F.2d at 752; accord *Petition of McShane*, 235 F. Supp. 262, 273 (N.D. Miss. 1964) (explaining that habeas corpus relief based on Supremacy Clause immunity should be denied "if there is material conflict of evidence"); Amaya Br. 18 (relying on *McShane*).

### ARGUMENT

The Supremacy Clause declares: "This Constitution, and the Laws of the United States . . .  shall be the supreme Law of the Land . . . , any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2. This clause ensures that states do not "retard," "impede," "burden," or "control" the execution of federal law. *McCulloch v. Maryland*, 17 U.S. 316, 317 (1819).

The Supremacy Clause can protect a federal officer from state prosecutions, but such protection is reserved for "exceptional" circumstances. *Baker v. Grice*, 169 U.S. 284, 291 (1898) ("Unless [a] case be of such an exceptional nature, [courts] ought not to encourage the interference of the federal court below with the regular course of justice in the state court."); see also *Birsch v. Tumbleson*, 31 F.2d 811, 814 (4th Cir. 1929) (explaining that the cases in which the Fourth Circuit discharged petitioners in advance of trial on the merits involved "*emergencies*" and were "*unusual* in that they present[ed] considerations which would not ordinarily arise, and in which the propriety of the acts of the federal officers was beyond question, and involved matters necessary to the orderly conduct of the business of the courts of

the United States, and the enforcement of the federal laws") (emphasis added); accord *Morgan v. California*, 743 F.2d 728, 731 (9th Cir. 1984) ("The power of the federal court to enjoin state criminal prosecutions . . . should be sparingly exercised."). "Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law." *Colorado v. Symes*, 286 U.S. 510, 518 (1932).

Supremacy Clause immunity is available only if a defendant establishes: (1) he was performing an act which he was authorized to do by federal law; and (2) in so doing, he did "*no more* than what was necessary and proper for him to do." *Cunningham v. Neagle*, 135 U.S. 1, 75 (1890) (emphasis added). The purpose of this test is to identify the extraordinary cases where a State's prosecution will "nullify[] federal laws by attempting to impede enforcement of those laws." *Morgan*, 743 F.2d at 731 (citing *Neagle*, 135 U.S. 1); see also *McCulloch*, 17 U.S. at 317.[15] Reserving Supremacy Clause immunity for such cases of "an exceptional nature," *Baker*, 169 U.S. at 291, accounts for the reality that Supremacy Clause immunity undermines the States' "pre-eminent[]" power "to make and enforce [their] own criminal laws," *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981). Indeed, the Supreme Court has been clear that courts "should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States." *Patterson v. New York*, 432 U.S. 197, 201 (1977).

Amaya has failed to show that every reasonable trier of fact would conclude that (1) Amaya was performing an act which he was authorized to do by federal law; and (2) Amaya's actions were "*no more* than what was necessary and proper for him to do." *Neagle*, 135 U.S. at 75 (emphasis added).

---

[15] Accord *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 6–7 (1906) (discussing *Neagle*, and explaining that the circumstances of *Neagle* were "peculiar" and "extraordinary," and that the case was decided on "exceptional facts").

**I.    Amaya is not entitled to Supremacy Clause immunity because a reasonable trier of fact could conclude that Amaya was not authorized by federal law to act as he did**

There is a genuine dispute as to whether Amaya acted within his authority when he pursued and killed Ghaisar. "For a federal official to be exempt from civil or criminal liability under state law," it is well-settled that "it is not enough that . . . he was present for an official purpose." *Isaac v. Googe*, 284 F. 269, 270 (5th Cir. 1922); see also *Symes*, 286 U.S. at 518. Rather, to be entitled to Supremacy Clause immunity, Amaya must show that killing Ghaisar was "an act which he was authorized to do" by federal law. *Neagle*, 135 U.S. at 75; *Isaac*, 284 F. at 270 (noting actions must be "done in pursuance of his official duty"). The relevant question is, therefore, whether there is a genuine dispute as to whether Amaya exceeded this authority when he pursued, confronted, and killed Ghaisar. Amaya fails the authorization prong of Supremacy Clause immunity twice: *first*, because his actions were outside the statutory authority of a Park Police officer; and *second*, because an officer per se lacks authority when they violate the Constitution or act with criminal intent.

**A.   Amaya's actions were inconsistent with federal law and Park Police policy**

Amaya's claim that he was authorized to kill Ghaisar is supported by no evidence and no authority. Amaya is simply wrong to suggest that employment as a Park Police officer should by itself be enough to avail him of Supremacy Clause immunity. Amaya Br. 11. "The mere fact that one is an officer of the United States . . . does not exempt him from civil or criminal liability for what he does beyond the scope of his official duties and not in the discharge thereof." *Isaac*, 284 F. at 270.

Contrary to Amaya's representations, the Park Police General Orders and applicable state and federal law do not support his broad claim of authority. Although Amaya boldly asserts that "[t]here is no serious question that [he] was performing an act he was authorized to perform

under the law," he fails to cite *any* specific provisions to substantiate this claim. Amaya Br. 12. And with good reason: Amaya's actions throughout his encounter with Ghaisar were largely inconsistent with Park Police policy.

*Amaya exceeded his limited authority to use and display his firearm.* Amaya's display and use of his firearm was in excess of his authority. Although Park Police officers may "carry firearms," 54 U.S.C. § 102701(a)(2)(A), their display is limited to situations in which "a degree of imminent danger exists that necessitates the possible use of the firearm for the officer's safety or the safety of others." USPP Gen. Or. 3601.02(D). Use of a firearm, moreover, is "limited to incidents that involve the potential loss of life or serious physical injury," USPP Gen. Or. 3601.01. Amaya's treatment of his firearm was grossly inconsistent with this policy.

Amaya displayed his firearm three separate times in his encounter with Ghaisar. See Summary Presentation at 10:03–05; Dashcam Video at 19:38:22–24 (Amaya immediately drawing his firearm during the first stop); Summary Presentation at 11:54–56; Dashcam Video at 19:40:12–15 (Amaya drawing his weapon at the second stop); Summary Presentation at 13:10–13; Dashcam Video at 19:41:29–31 (Amaya confronting Ghaisar at gunpoint for a third and final time). Although Amaya had an obligation to "immediately notify" his supervisor "by radio or other available means" if circumstances required him to display his firearm, USPP Gen. Or. 3601.04(E), nothing in the record suggests he did so.

The limited circumstances permitting Park Police officers to utilize deadly force are also absent. Park Police officers are instructed "to employ only the minimum level of force necessary to control a situation." USPP Gen. Or. 3615.02 (Ex. M). Use of deadly force is "only justified" if an individual "committed a felony" involving "the infliction or threatened infliction of serious physical injury or death" and their escape "would pose an imminent threat of serious physical

harm." *Id.* at 3615.03(C)(2). Ghaisar was suspected of leaving the scene of an accident in violation of Virginia Code § 46.2-894. As Amaya recognizes, violation of this statute will often be a misdemeanor. See Amaya Br. 5; see also note 7, *supra*. Construing the facts in the light favorable to the Commonwealth, Ghaisar's alleged violation of Virginia Code § 46.2-894 (or any of the other offenses Amaya hypothesizes Ghaisar may have committed, see note 17, *infra*) did not satisfy the conditions necessary to justify Amaya's use of deadly force. See USPP Gen. Or. 3615.03(C)(2).

*Amaya exceeded his pursuit authority*. Officers' authority to engage in vehicular pursuits does not sweep as broadly as Amaya suggests. Under Park Police policy, "[t]he act of fleeing and eluding the police shall not in itself be a pursuable offense." USPP Gen. Or. 2205.01. Vehicular pursuits are authorized only when an officer believes (or has reason to believe) a *felony* has occurred or when "[t]he suspect presents a clear and immediate threat to public safety if not immediately apprehended." *Id.* at 2205.01(B). The same is true under Virginia law. See Va. Code. § 19.2-79 (emphasizing that law enforcement who "enters this Commonwealth in close pursuit" can follow a fleeing suspect "on the grounds that he has committed a felony"). But when the officers initiated the pursuit, it was far from clear that Ghaisar had committed a felony, as Amaya admits. See Amaya Br. 5; see also note 7, *supra*. And whether Ghaisar presented a threat to public safety, too, was less than clear at the time the officers initiated pursuit. Expert Report of Dr. Christopher Chapman (Expert Report) (Ex. N) at 120 (noting "[a] reasonable officer placed in Officer Amaya's position would not have reasonably believed Mr. Ghaisar was an imminent threat . . . based upon the information [he] possessed during the evolution of the incident").

Even if the pursuit had been justified at the outset, continuing it off the George Washington Parkway was not. Under the Park Police General Orders, vehicular pursuits are only

authorized in "areas of primary Force jurisdiction." USPP Gen. Or. 2205.01. When they extend outside these locations, officers must "relinquish[] [the pursuit] to police units of the entered jurisdiction" "[a]s soon as practical." *Id.* at 2205.04(B)(4). Notwithstanding this policy, the officers pursued Ghaisar well into a residential neighborhood outside the Park Police's primary jurisdiction and into the Fairfax County Police Department's domain. See, *e.g.*, Summary Presentation at 11:36–45; Dashcam Video at 19:39:55–40:03 (pursuit continuing onto West Boulevard). Their refusal to relinquish control is particularly unreasonable because: (i) the officers had affirmatively requested assistance from the Fairfax County Police Department, Amaya Br. 6, and (ii) members of that unit were actively attempting to render aid. See, *e.g.*, Summary Presentation at 12:53–56; Dashcam Video at 19:41:11–19:41:15 (showing Officer Hartzell attempting to deploy stop sticks on Alexandria Avenue). The officers' actions thus exceeded their pursuit authority.

*Amaya exceeded his statutory arrest authority*. Amaya claims he had the authority to arrest Ghaisar "for his crimes." Amaya Br. 7. He is wrong. The facts do not support Amaya's arrest authority. Park Police officers' power to make warrantless arrests is limited. Park Police may make warrantless arrests only "within the [National Park] System" or outside of the system when the arrestee "is fleeing from the System to avoid arrest" for "any offense *against the United States* committed in the presence of [an] officer" or "any *felony* cognizable under the laws of the United States." 54 U.S.C. § 102701(a)(2)(B) (emphases added). Construing the facts in the light most favorable to the Commonwealth, none of these circumstances were present here.

First, because the shooting occurred off the Parkway, outside of the National Park System, Amaya only had authorization to arrest Ghaisar under federal law if Ghaisar was "fleeing . . . *to avoid arrest*." 54 U.S.C. § 102701(a)(2)(B) (emphasis added); see also *United*

*States v. Allen*, No. 17-po-7135, 2018 WL 1035770, \*4 (D. Md. Feb. 23, 2018) (recognizing Park Police officer "lacked the statutory authority" to arrest the defendant off the Baltimore-Washington Parkway because he was "not fleeing from the officer"); *United States v. Hernandez-Ayala*, No. 16-po-4622, 2017 WL 2666243, \*3 (D. Md. June 21, 2017) (same). This provision requires that "a defendant have knowledge that he is being pursued by police and a resultant intention to evade arrest." *United States v. Jones*, 428 F. Supp. 2d 497, 500–01 (W.D. Va. 2006);[16] see also *United States v. LaFountain*, No. 12-po-6164, 2013 WL 391153, \*2 (D. Mass. Jan. 29, 2013). Amaya sets forth no argument—much less evidence—that 54 U.S.C. § 102701(a)(2)(B)'s intent requirement was met here. In fact, "[i]t is objectively reasonable to consider that a reasonable person placed in Mr. Ghaisar's position would have been in fear of immediate bodily harm when they observed Officer Amaya approaching their vehicle with a firearm pointed at them." Expert Report at 94 (parenthetical omitted)); see also Amaya Br. 7 (noting Ghaisar twice "placed his hands over his face" when the officers confronted him). Whether Ghaisar had the intent to evade arrest (or was fleeing because he was in fear) is a genuine issue that not only defeats Amaya's statutory authority but also his motion to dismiss.

Second, there was no "offense against the United States" or "felony cognizable under the laws of the United States." 54 U.S.C. § 102701(a)(2)(B). The offense Amaya identifies—leaving the scene of a vehicle collision in violation of Virginia Code § 46.2-894 (see Amaya Br. 5)—is a *state*, not federal, law; therefore, it is not a felony "against the United States."[17] 54 U.S.C.

---

[16] *Jones* discusses 16 U.S.C. § 1a-6(b), Section 102701's predecessor. The condition that Park Police may only perform warrantless arrests "provided such arrests occur within th[e National Park] system or the person to be arrested is fleeing therefrom to avoid arrest" remains substantively unchanged. 428 F. Supp. 2d at 500 (quoting 16 U.S.C. § 1a-6(b)).

[17] Despite his representations to the contrary now, violation of Virginia Code § 46.2-894 is, in fact, the only charge the officers gave to justify the pursuit. See Summary Presentation 9:07–17 (Dispatch: "U.S. Park Police, what's going to be your charges, just the accident?"

§ 102701(a)(2)(B). Amaya himself admits he did not know whether any suspected violation of Virginia Code § 46.2-894 rose to the level of a felony at the time the officers began their pursuit. Amaya Br. 5. Construing the facts in the light most favorable to the Commonwealth, Amaya is not entitled to a presumption that any violation of Virginia Code § 46.2-894 was a felony.

*      *      *

Merely being a federal officer does not exempt Amaya from "criminal liability for what he does beyond the scope of his official duties." *Isaac*, 284 F. at 270. Even if Amaya pursued Ghaisar "for an official purpose," to be immune, the act for which he seeks immunity "must be done in pursuance of his official duty." *Id.* Without probable cause to arrest Ghaisar for a federal offense, 54 U.S.C. § 102701, or felony, see, *e.g.*, Va. Code Ann. § 19.2-79, Amaya's actions of chasing, shooting, and killing Ghaisar were not in pursuance of his official federal duty. *Drury*, 200 U.S. at 8; *Isaac*, 284 F. at 270. At the very least, there is a genuine dispute as to whether Amaya exceeded his authority when he took Ghaisar's life.

---

Officers: "Uh, Park Police, ten-four, it's going to be fleeing from the scene of an accident at this point."). Amaya now speculates about a host of other potential violations. See Amaya Br. 9. But even the vast majority of those do not constitute a felony—all but one are principally misdemeanors. See, *e.g.*, 18 U.S.C. § 111 (assault of an officer only a felony if "acts involve physical contact with the victim of that assault or the intent to commit another felony'); Va. Code Ann. § 46.2-894 (hit-and-run only a felony if "the accident results in injury to or the death of any person, or if the accident results in more than $1000 of damage to property"); Va. Code Ann. § 18.2-266 (driving while intoxicated only a felony if "convicted of three offenses" under the provision "within a 10-year period" see Va. Code Ann. § 18.2-270(C)(1)); Va. Code Ann. § 46.2-852 (reckless driving only a felony if the driver was "driving without a valid operator's license due to a suspension or revocation for a moving violation" and the reckless driving "caused the death of another," see Va. Code Ann. § 46.2-868(B)). The only provision Amaya cites which is *always* a felony—18 U.S.C. § 1114—arises when a person "kills or attempts to kill" an officer, and such a charge against Ghaisar is hardly supported by the facts presented.

### B. Amaya's authority did not extend to violations of the Constitution and to actions taken with criminal intent

An officer necessarily exceeds the scope of his authority when he violates federal constitutional law or acts with a culpable mens rea in violating state criminal law. "[A] federal officer's actions . . . fail to qualify as 'necessary and proper' if committed in violation of the negative injunctions of the Constitution." *Denson v. United States*, 574 F.3d 1318, 1347 (11th Cir. 2009). Likewise, "[a] federal agent may lose his *Neagle* protection if he acts out of personal interest, malice, or with actual criminal intent." *Maryland v. DeShields*, 829 F.2d 1121, *6 (4th Cir. 1987) (table). A violation of either, therefore, dooms Amaya's immunity claim.

1.          Amaya exceeded the scope of his federal duties by violating Ghaisar's Fourth Amendment rights. When federal officers act contrary to their constitutional mandate, they are not immune from state prosecution. *Neagle*, 135 U.S. at 81. A Fourth Amendment violation, therefore, is necessarily fatal to a Supremacy Clause immunity claim. The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures.'" *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend. IV). The Fourth Amendment's bar on unreasonable seizures prohibits the use of excessive force by a police officer in effectuating an arrest. *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1550 (2020). To determine whether an officer's use of force is excessive, courts apply a "standard of objective reasonableness." *Id.* (internal citation omitted).[18] "Because

---

[18] The Fourth Amendment inquiry is thus similar to the second part of the test the Second Circuit laid out in *Tanella* by looking at whether the federal official's actions were objectively unreasonable, see Part II(C), *infra*.

Although a holding that a federal official violated a victim's Fourth Amendment rights is *sufficient* to defeat both prongs of the *Neagle* inquiry—because a federal official's actions violating the Fourth Amendment cannot be authorized by federal law and because a federal official's actions violating the Fourth Amendment are, by definition, not objectively

the 'intrusiveness of a seizure by means of deadly force is unmatched,' a police officer may use deadly force only if the officer has 'probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* (internal citations omitted).

Amaya admits he did not know whether he was pursuing Ghaisar in connection with "a felony or misdemeanor offense."[19] Amaya Br. 5. Even if Amaya had reason to believe that Ghaisar was a fleeing felon, "[t]he use of deadly force to prevent the escape of *all* felony suspects, whatever the circumstances, is constitutionally unreasonable." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (emphasis added). Rather, the Supreme Court has stressed that when "the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.*; see also *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019) ("Indeed, an officer may reasonably apply deadly force to a fleeing suspect—even someone suspected of committing a serious felony— only if the officer has 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" (quoting *Garner*, 471 U.S. at 3)). Here, Amaya does nothing to support his assertion that there was an "immediate threat" necessitating drawing his firearm on three separate occasions and shooting at Ghaisar. At the very least, there is a genuine dispute as to whether Amaya's conduct violated the Fourth Amendment.

2.      Amaya's criminal culpability also means he necessarily exceeded his federal authority. When officers act "wantonly, with a criminal intent," they cannot also "act[ ] within the scope of the authority conferred by the laws of the United States." *In re Fair*, 100 F.149, 155

---

reasonable—a holding that a federal official violated a victim's Fourth Amendment rights is not *necessary* to defeat Supremacy Clause immunity.

[19] See note 7, *supra*. The other crimes Amaya suggests Ghaisar committed are also not clearly felonies. See note 17, *supra*.

(C.C.D. Neb. 1900); *Symes*, 286 U.S. at 518 ("While homicide that is excusable or justifiable may be committed by an officer in the proper discharge of his duty, murder or other criminal killing may not."); *DeShields*, 829 F.2d at *6.

Amaya was indicted by the special grand jury on two counts: reckless discharge of a firearm in violation of Virginia Code § 18.2-56.1(A1) and involuntary manslaughter in violation of Virginia Code § 18.2-36. ECF #1-1. The indictments allege that Amaya "handle[d] a firearm in a manner so gross, wanton, and culpable as to show a reckless disregard for human life," ECF #1-1 at 2 (charging Amaya with reckless handling of a firearm in violation of Code § 18.2-56.1), and, in so doing, Amaya "did feloniously kill and slay Bijan Caesar Ghaisar," *id.* at 1 (charging Amaya with involuntary manslaughter in violation of Code § 18.2-36). Under Virginia law, this means Amaya discharged his firearm with a "conscious[] disregard of [Ghaisar's] rights," or with "reckless indifference" to the harm that "would probably result." Mathew Bender & Company, Inc., Virginia Model Jury Instructions – Civil: Release 20, March 2020, Instruction No. 4.040, (last accessed July 15, 2021, 11:30 a.m.) http://www.courts.state.va.us /courts/circuit/resources/model_jury_instructions_civil.pdf (defining "willful and wanton" conduct); see also *Sotnikau v. Lynch*, 846 F.3d 731, 736 (4th Cir. 2017).[20]

---

[20] Amaya is simply wrong in suggesting that the Commonwealth's case is "one of negligence." Amaya Br. 16. Evidence of malice is sufficient to defeat Supremacy Clause immunity, but it is by no means necessary. See, *e.g.*, *Horiuchi*, 253 F.3d at 366 n.10 ("There are, of course, numerous ways a federal officer might abuse his authority, without exhibiting a bad intent. For instance, an agent may not torture a kidnapper to reveal the whereabouts of his victim, even though he believes it necessary to perform his job."); *Arizona v. Files*, 36 F. Supp. 3d 873, 878 (D. Ariz. 2014) ("[A] state opposing a Supremacy Clause immunity defense need not necessarily show the federal officer acted with malice" for "the officer's conduct" to "fall outside the scope of the defense" (internal quotation marks and citation omitted)). Elementary principles of criminal law recognize that "negligence" is different than "recklessness," See Model Penal Code § 2.02(c) (defining "reckless[ness]" as the "conscious[] disregard[] [of] a substantial and unjustifiable risk that the material element exists or will result from [their] conduct") & (d)

If Amaya exhibited culpable recklessness in his use of his firearm, that is sufficient to strip him of Supremacy Clause immunity. Amaya violated policy when he immediately drew his firearm upon approaching Ghaisar's vehicle. Summary Presentation at 10:03–05; Dashcam Video at 19:38:22–24 (first display); Summary Presentation at 11:54–56; Dashcam Video at 19:40:12–15 (second display). He then struck Ghaisar's car with his firearm during the first stop for no ascertainable reason. See Summary Presentation at 10:06–07; Dashcam Video at 19:38:25–26. This was also in contravention of Park Police policy which prohibits using firearms as "an impact weapon" except to protect "another person from death or serious injury." USPP Gen. Or. 3601.02(C). This extreme response (which is omitted from Amaya's recitation of the facts) is not only inconsistent with Park Police policy, it is indicative of the kind of intent Amaya seeks to disclaim. See Amaya Br. 15 ("If [Amaya] had any malicious intent whatsoever, it certainly would have manifested itself much earlier in the encounter.").

Amaya's reckless use of his firearm culminated in his decision to discharge five shots into Ghaisar's Jeep despite the substantial and unjustifiable risk to Ghaisar's life and the lives of others in the area. Summary Presentation at 13:14; Dashcam Video at 19:41:33 (shot one); Summary Presentation at 13:16–17; Dashcam Video at 19:41:34–35 (shots two through four); Summary Presentation at 13:38; Dashcam Video at 19:41:57 (shot five).

Viewing the evidence in the light most favorable to the Commonwealth and assuming the truth of the allegations in the indictment, *Horiuchi*, 253 F.3d at 367, there is at least a genuine dispute as to whether Amaya acted with sufficiently culpable mens rea.

\*       \*       \*

---

(defining "negligence" as actions taken when one "should be aware of a substantial and unjustifiable risk that the material element exists or will result from [their] conduct").

Because there are genuine issues of fact as to whether Amaya's pursuit and killing of Ghaisar were in pursuance of any federal duty, Amaya is not entitled to immunity from state prosecution at the Rule 12 stage. See *Morgan*, 743 F.2d at 734 (denying habeas relief based on Supremacy Clause immunity when evidence raised dispute over whether federal drug enforcement agents acted in pursuit of official duties); *see also Birsch*, 31 F.2d at 816 (affirming denial of writ of habeas corpus to federal game warden charged in state court after killing two poachers because evidence was conflicting as to who fired first). His motion should be denied.

## II. Amaya is not immune because he failed to eliminate any dispute that, in pursuing and killing Ghaisar, his actions were no more than necessary and proper in performing his federal duties

The Supreme Court has made clear that a federal official is not entitled to Supremacy Clause immunity unless "he did *no more* than what was necessary and proper for him to do." *Neagle*, 135 U.S. at 75 (emphasis added).[21] Some courts describe the "necessary and proper" standard as containing "two conditions" that "must be satisfied": (1) the actor must subjectively believe that his action is justified; *and* (2) that belief must be objectively reasonable. *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) (emphasis added); *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017) (internal citations omitted), *cert denied* 138 S. Ct. 642 (2018); accord *Horiuchi*, 253 F.3d at 366 n.11 ("[T]he test is both objective and subjective: The officer is denied immunity unless he demonstrates that he believed both reasonably *and* honestly that his conduct

---

[21] Amaya asserts that his "actions on the day of the encounter were 'necessary and proper' to protect his life and the lives of others while performing his duties as a United States Park Police officer." Amaya Br. 1. By ignoring the words "no more," Amaya fundamentally changes the standard.

was lawful.").[22] This Court, however, need not consider these conditions because it is clear that Amaya's actions were neither "necessary" nor "proper" under any formulation.

As an initial matter, the Commonwealth's evidence—at the very least—creates a genuine issue of fact that, by pursuing and killing Ghaisar, Amaya did more than what was necessary and proper to perform his federal duties. If he lacked authority to take the actions he took, see Part I(A), *supra*, they were not "proper." If ready alternatives would have allowed him to fulfill his law enforcement duties in a less fatal way, his actions were hardly "necessary." See Part II(A) & (C), *infra*. And in any event, Amaya failed to eliminate any genuine dispute under the *Tanella* test. The Commonwealth's evidence (at the very least) creates a genuine issue as to whether Amaya believed his actions were justified, see Part II(B), *infra*, and whether any offered subjective belief was objectively reasonable, see Part II(C), *infra*. Amaya, therefore, is not entitled to Supremacy Clause immunity.

### A.  Amaya's actions exceeded what was necessary and proper

At the very least, there is a genuine dispute as to whether Amaya's actions surpassed what was necessary or proper to effectuate his duties. As to what was proper, Amaya engaged in numerous actions that conflicted with Park Police policy and training. See Part I(A), *supra*. Amaya does not address—let alone explain—why it was "proper" for him to immediately draw his firearm each time he approached Ghaisar's vehicle. Nor does he explain how it was "proper" for him to physically strike Ghaisar's vehicle with his firearm. These actions exceeded the scope

---

[22] It is unclear whether the subjective prong remains a valid part of the Supremacy Clause immunity analysis. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court rejected the subjective prong of the qualified immunity defense and held that qualified immunity requires only a showing that the official's conduct was objectively reasonable. Various lower courts have expressed doubt about whether the subjective prong of the Supremacy Clause analysis survives *Harlow*. See, *e.g.*, *Horiuchi*, 253 F.3d at 365 n.7; *Wyoming v. Livingston*, 443 F.3d 1211, 1222 (10th Cir. 2006).

of Amaya's authority and thus rendered his actions improper. See *Horiuchi*, 253 F.3d at 366 n.10 ("There are, of course, numerous ways a federal officer might abuse his authority . . . [f]or instance, an agent may not torture a kidnapper to reveal the whereabouts of his victim, even though he believes it necessary to perform his job."). That in and of itself defeats Amaya's motion. See *Neagle*, 135 U.S. at 75 (requiring that actions must be both necessary *and* proper).

As to what was necessary, the existence of alternatives severely undermines Amaya's contention that his actions were "no more" than what was required. As the expert report stresses, there were numerous reasonable alternatives available, rendering the use of deadly force unreasonable. See Expert Report at 122, 139, 151–52, 181. For one thing, Amaya could have attempted to terminate the pursuit. See USPP Gen. Or. 2205.04(A)(4)(b) (noting that "the decision to terminate a pursuit by the officer" is sometimes "the most prudent course of action," particularly where, as was the case here, "[t]he suspect's identity [was] established" and the "need for immediate apprehension" was not present); see also Expert Report at 177, 181. For another, stop sticks could have deflated Ghaisar's tires and ended the encounter. Summary Presentation at 12:53–56; Dashcam Video at 19:41:11–19:41:15 (showing Fairfax County Police Department attempting to deploy stop sticks); Expert Report at 139, 152. Or, if the pursuit *had* to continue, the officers could have ceded control to Fairfax County or allowed one of the two helicopters circulating the area to follow Ghaisar from the sky. Expert Report at 139, 151. The pursuit did not have to reach such a tragic conclusion. Amaya cites no evidence for his assertion that killing Ghaisar was "necessary."

Bijan Ghaisar is dead in part because Amaya chose to confront Ghaisar through dangerous and unnecessary means, despite other available options. Construing the facts in the

light most favorable to the Commonwealth, Amaya's actions were far more than what was necessary and proper.

**B. A reasonable trier of fact could disagree with Amaya's summary assertion that he had a subjective belief that Ghaisar posed a risk to officers or the public**

Amaya's motion fails the two-part *Tanella* framework for analyzing whether his actions were necessary and proper. Unsubstantiated statements of Amaya's subjective belief in his brief are no substitute for actual evidence. The cases on which Amaya himself relies demonstrate how federal officials can support their subjective belief—with affidavits, declarations, testimony, and the like. See, *e.g.*, *Kleinert*, 855 F.3d at 317–18 (relying on defendant's evidentiary hearing testimony to inform subjective belief); *Tanella*, 374 F.3d at 150 (noting grand jury testimony did not establish that defendant "'acted wantonly' or with 'criminal intent'"); *Horiuchi*, 243 F.3d at 368 (citing excerpts from the defendant's testimony when discussing whether his belief was reasonable); *Clifton v. Cox*, 549 F.2d 722, 724, 729 (9th Cir. 1977) (concluding the habeas "petitioner show[ed] . . . that he had an honest and reasonable belief" following a three-day evidentiary hearing); *Files*, 36 F. Supp. 3d at 879, 884 (emphasizing gaps in defendant's evidentiary hearing testimony); *Petition of McShane*, 235 F. Supp. 262, 275 (N.D. Miss. 1964) (relying on affidavit to substantiate belief). This is because "statements by counsel in briefs or in court are *not* evidence," and they cannot be treated as such. *United States ex rel. Bradshaw v. Alldredge*, 432 F.2d 1248, 1248 n.1 (3d Cir. 1970) (emphasis added); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) ("counsel's statements [a]re not evidence in the case" (internal quotation marks omitted)).[23] Amaya's failure to do anything to substantiate his

---

[23] See also *Ging v. Ging*, 18 Neb. App. 145, 150, 775 N.W.2d 479, 484 (2009) ("of course, statements of counsel in a brief are not evidence"); accord *S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir.

subjective belief eliminates his Supremacy Clause immunity defense under the *Tanella* test and

makes his request to "dismiss the case without an evidentiary hearing" all the more

inappropriate. Amaya Br. 23.

### C. Even if Amaya subjectively believed his actions were justified, a reasonable trier of fact could find that belief objectively unreasonable

The objective reasonableness of Amaya's asserted belief is undercut by the evidence.

Again citing nothing, Amaya's motion simply asserts that "he honestly believed [the discharge of

his firearm] was necessary to protect his life, the lives of his fellow officers and the public at

large." Amaya Br. 13. Pointing to no evidence, Amaya claims that "[h]e believed he was in

danger of dying if he did not take the action he took when he took it." *Id.* This simple assertion

cannot be squared with Amaya's training (and Park Police policy), his actions in response to the

circumstances presented, or the many alternatives available to him that would have prevented the

use of deadly force.

*Training and policy.* The mismatch between Amaya's training and his actions undermine

any suggestion that it was objectively reasonable for him to conclude his actions were justified.

As the Supreme Court has explained in the qualified immunity context, "whether it was

objectively legally reasonable to conclude that a given [action] was supported by [law] will often

require examination of the information possessed by the [acting] officials." *Anderson v.

Creighton*, 483 U.S. 635, 641 (1987). And "it may be difficult to conclude that the officers acted

reasonably if they performed an action that had been banned by their department or of whose

dangers . . . they had been warned." *Gutierrez v. San Antonio*, 139 F.3d 441, 449 (5th Cir.

1982) ("a party cannot manufacture a genuine issue of material fact merely by making assertions
in its legal memoranda").

1998).[24] When he joined the Park Police, Amaya trained at the Federal Law Enforcement

Training Center for months, where he learned about proper techniques to effectuate a stop and

use his firearm. See Amaya Transcript; Part I(A), *supra*. Amaya represents that, throughout the

course of his career, he accumulated "significant experience" responding to "difficult situations,"

Amaya Br. 15. And yet, Amaya's response to this situation—including his decisions to

immediately draw his firearm at each stop, smack the firearm into Ghaisar's vehicle, kick

Ghaisar's vehicle, position himself (weapon drawn) close to Ghaisar's vehicle, and shoot at

Ghaisar five times—is grossly inconsistent with that training and experience. It strains credulity

to accept that Amaya could have believed that his actions were justified despite their departure

from policy, let alone that his asserted belief was objectively reasonable.

   *Amaya's actions*. The circumstances under which Amaya acted, moreover, negate the

objective reasonableness of his asserted belief. Amaya's conclusory assertion that his "decision

to discharge his firearm was 'necessary and proper' because he honestly believed it was

necessary to protect his life, the lives of his fellow officers and the public at large" (Amaya Br.

13) is belied by the evidence that Amaya himself submitted (but never cited) to this Court. See

Amaya Br. n.1 (generally citing the Summary Presentation); accord Expert Report at 140 (noting

Ghaisar's Jeep was moving *away* from Amaya and he was not directly in front of Ghaisar's car).

---

[24] This is consistent with numerous federal courts of appeal that have likewise concluded that the training an officer receives is a relevant consideration when evaluating the reasonableness of his use of force. See, *e.g.*, *Martin v. Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013) (concluding officers had violated clearly established law when their training "alerted them to the potential danger of [a] particular type of excessive force" (internal quotations and citation omitted)); *Drummond ex rel. Drummond v. Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) ("Anaheim's training materials are relevant not only to whether the force employed in this case was objectively unreasonable, but also to whether reasonable officers would have been on notice that the force employed was objectively unreasonable." (internal citation omitted)); *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) ("[T]he reasonableness of an officer's actions must be assessed in light of the officer's training.").

If anything, the evidence supports the conclusion that any "life-or-death situation" Amaya confronted (Amaya Br. 22) was a consequence of his own doing, Summary Presentation at 13:10–13; Dashcam Video at 19:41:29–31 (reflecting Amaya's decision to get out of the cruiser in front of Ghaisar's Jeep); Expert Report at 137 (noting "[a] reasonable officer . . . would have reasonably known that it would be contrary to . . . police training/standards to place their body in front of Mr. Ghaisar's vehicle"); *id.* at 140 (noting Amaya "could have reasonably moved out of the path of Mr. Ghaisar's vehicle"). At the very least, there is a genuine issue as to whether it was objectively reasonable for Amaya to believe it was necessary for him to kill a person suspected of committing a non-violent misdemeanor "to save his own life and that of others." Amaya Br. 17; accord Expert Report at 137 ("It is reasonable to consider that Officer Amaya's targeting of his firearm at Mr. Ghaisar was to prevent Mr. Ghaisar from escaping and not because he (Officer Amaya) reasonably believed Mr. Ghaisar was an imminent threat.").

The facts plainly contradict Amaya's unsupported assertion that he "maintained professionalism, patience and restraint while exercising good judgment." Amaya Br. 15; accord, *e.g.*, Expert Report at 139–40. Whether he believed his actions were necessary is questionable, and whether they were objectively reasonable is even more so. The unsupported assertions in Amaya's memorandum of law cannot negate a genuine dispute of fact when the Commonwealth introduced evidence undercutting Amaya's purported (yet unsupported) subjective belief.[25]

---

[25] Accord *Wagner v. Southern Calif. Edison Co.*, No. 2:16-cv-06259-ODW(PLA), 2019 WL 1746127, at \*4 (C.D. Cal. Apr. 18, 2019), *aff'd*, 840 Fed. Appx. 993 (9th Cir. 2021) ("one sentence, conclusory statement that '[party] has presented ample evidence of his objectively reasonable belief'" was merely a "bare assertion" that was "insufficient to overcome a motion for summary judgment" and "[c]ontrary to [that party's] conclusory statement, [the party] presented no evidence to support his prima facie case that he had [the asserted] subjective belief"); *Gulf Islands Leasing, Inc. v. Bombardier Cap., Inc.*, 215 F.R.D. 466, 475 (S.D.N.Y. 2003) (denying motion for protective order when "[o]ther than the unsupported statements in its memoranda of

\*       \*       \*

As the Ninth Circuit explained, "Supremacy Clause immunity is not absolute and . . . presupposes that federal agents *can* be prosecuted for violating state law." *Horiuchi*, 253 F.2d at 376 (emphasis added). Supremacy Clause immunity is reserved for the "exceptional" case where a state's prosecution will nullify federal laws. *Baker*, 169 U.S. at 291; *Morgan*, 743 F.2d at 731.

Relying only on a *dissent*, Amaya asserts that qualified immunity cases "require a more stringent standard be met before immunity can be granted to an officer." Amaya Br. 20–21 (citing only Judge Hawkins' dissent in *Horiuchi*). He is incorrect. Any interpretation that renders Supremacy Clause immunity less stringent than qualified immunity cannot be squared with the Supreme Court's admonition that the Supremacy Clause protects federal officer from state prosecutions only in "exceptional" circumstances. *Baker*, 169 U.S. at 291; see also *Birsch*, 31 F.2d at 813; accord *Morgan*, 743 F.2d at 731 ("The power of the federal court to enjoin state criminal prosecutions . . . should be sparingly exercised."). As the Supreme Court emphasized in *Neagle*, the "power to enforce its laws and to execute its functions in all places does not derogate from the power of the state to execute its laws at the same time and in the same places. The one does not exclude the other, except where both *cannot* be executed at the same time." *Neagle*, 135 U.S. at 60–61 (emphasis added). The Supremacy Clause has never contemplated immunity from state charges for federal officers who kill outside the scope of their federal authority. And if such an immunity were available, in no event would such officers be immune where they exceeded the scope of (and acted contrary to) their federal duties. Amaya's cavalier approach to Supremacy Clause immunity cannot be squared with the respect given to states as sovereigns.

---

law, however, [movant] submitted no evidence in its initial motion papers that would establish that [movant] subjectively believed at the time that litigation was imminent").

*Heath v. Alabama*, 474 U.S. 82, 93 (1985) ("Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code.").

Based on the evidence, a reasonable fact finder could conclude that Amaya's actions exceeded the scope of his authority and any subjective belief that his actions were justified was objectively unreasonable. At the very least, there are material questions of fact in dispute which, if resolved against Amaya, negate any claim to Supremacy Clause immunity. A 25-year-old is now dead because of Amaya's actions. Like anyone else indicted for violating the law, Amaya should face trial on the charges brought against him.

### CONCLUSION

The motion to dismiss should be denied.

Respectfully submitted,

By:     */s/ Michelle S. Kallen*
Michelle S. Kallen (VSB No. 93286)
*Acting Solicitor General*

Mark R. Herring (VSB No. 31718)
*Attorney General*

Erin B. Ashwell (VSB No. 79538)
*Chief Deputy Attorney General*

Steve T. Descano (VSB No. 89881)
*Commonwealth's Attorney for Fairfax County*

Kyle Manikas (VSB No. 71234)
*Chief Deputy Commonwealth's Attorney*

Matthew B. Lowery (VSB No. 41662)
*Deputy Commonwealth's Attorney*

Kendall T. Burchard (VSB No. 95710)
*John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2021, a true and accurate copy of this paper was filed electronically with the Court's CM/ECF system, which will then send a notification of such filing to the parties, including:

Jonathan Leo Fahey
TATE BYWATER
2740 Chain Bridge Road
Vienna, VA 22181
jfahey@tatebywater.com

_/s/ Michelle Kallen_
Michelle S. Kallen (VSB No. 93286)
*Acting Solicitor General*
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us